UNITED STATES DISTRICT COURT                    ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                :
HANCY MAXIS,                                    :
                                                :
                            *Petitioner,*       :        MEMORANDUM AND ORDER
                                                :
            - against -                         :        10-CV-1016 (JG)
                                                :
WILLIAM E. PHILIPS and THE ATTORNEY             :
GENERAL OF THE STATE OF NEW YORK,               :
                                                :
                                                :
                            *Respondents.*      :
-------------------------------------------------------------x

A P P E A R A N C E S :

        ROBERT D. DIDIO
                Law Office of Robert DiDio
                80-02 Kew Gardens Road
                Third Floor
                New York, New York 11415
        By:     Robert D. DiDio and Danielle Muscatello
                *Attorneys for Petitioner*

        CHARLES J. HYNES
                Kings County District Attorney
                350 Jay Street
                Brooklyn, New York 11201
        By:     Lori Glachman
                *Attorney for Respondents*

JOHN GLEESON, United States District Judge:

        Hancy Maxis petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Maxis seeks relief from his May 2002 conviction in New York State Supreme Court, Kings

County of second-degree murder.  He challenges his conviction primarily on the ground of

ineffective assistance of counsel, but also alleges that the trial court committed constitutional

error in denying his counsel's request for a continuance at sentencing.  Oral argument was heard

on September 28, 2010, and an evidentiary hearing, followed by additional oral argument, was conducted on November 15, 2010. For the reasons set forth below, Maxis's petition is denied.

BACKGROUND

A.    *The Offense Conduct*

The evidence at trial established that on July 25, 2001, Maxis and John Cooper got into an altercation in front of Cooper's apartment building in Brooklyn. Yolanda Stokes,[1] Maxis's girlfriend, attempted to help Maxis in the fight by hitting Cooper over the head with a beer bottle, but Cooper did not relent. After a few minutes of fighting in which Cooper quickly gained the upper hand over Maxis, Maxis retreated to his vehicle, retrieved a gun from underneath the driver's seat, walked back towards Cooper, and shot him four times at close range, killing him. Maxis and Stokes then fled the scene in Maxis's vehicle.

B.    *Procedural History*

1.    *The Trial Court Proceedings*

In connection with his conduct on July 25, 2001, Maxis was charged with two counts of second-degree murder under N.Y. Penal Law § 125.25(1) and (2), and other related offenses.

a.    *The* Dunaway/Huntley/Wade *Hearing*

On April 18 and 22, 2002, Justice Carolyn Demarest of the New York State Supreme Court, Kings County held a combined *Dunaway/Huntley/Wade* hearing[2] on Maxis's

---

[1]    Stokes, Maxis's co-defendant, was charged with assault in the second degree among other offenses in connection with this incident. She pled guilty on April 11, 2002 to assault in the third degree and received a sentence of three years' probation.

[2]    A *Dunaway* hearing is held to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial. *See Dunaway v. New York*, 442 U.S. 200 (1979). A *Huntley* hearing tests the voluntariness of a defendant's post-arrest statements. *See People v. Huntley*, 15 N.Y.2d 72 (1965). A *Wade* hearing is held to assess whether the state used unduly suggestive identification procedures to obtain evidence against a defendant in violation of due process. *See United States v. Wade*, 388 U.S. 218 (1967).

pretrial omnibus motion. By that motion, Maxis sought to suppress statements obtained at the time of his warrantless arrest and evidence concerning the pre-trial identifications of him.[3] Detective William Ryan testified regarding his investigation of the shooting on the evening of July 25, 2001. Ryan ascertained Maxis's license plate number from a witness at the scene, prepared a photo array from which a witness identified Maxis, and obtained Maxis's address through further investigation of his license plate number. Ryan then visited that address, 109 East 95th Street, Brooklyn, with several other detectives the following day, and searched Maxis's vehicle, which was parked at the end of a common driveway at 109 East 95th street and was partially visible from the street. He also arrested Maxis and Stokes after calling the Emergency Services Unit to break down the door to Maxis's apartment, and brought Maxis to the precinct that afternoon. Later that evening, Ryan placed Maxis in a line-up, where he was identified by two witnesses separately. Ryan thereafter read Maxis his *Miranda* rights, after which Maxis gave a statement placing himself at the crime scene.

After hearing Ryan's testimony, the trial court found that a *Payton* violation had occurred when Maxis was arrested in his home without a warrant. *See Payton v. New York*, 445 U.S. 573, 576 (1980) (holding that Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest). The hearing then continued with the testimony of Shante Wills, Cooper's former girlfriend who had been physically abused by Cooper in the past. Wills testified that she witnessed the physical altercation between Maxis, to whom she referred as "Yolanda's boyfriend," which began when Stokes told Maxis that Cooper had been in her face. Wills testified that after Cooper gained the

---

[3] Defense counsel also moved for a *Mapp* hearing to determine whether the seizure of physical evidence from Maxis violated his constitutional rights. *See Mapp v. Ohio*, 367 U.S. 643 (1961). The trial court denied this request in light of the People's assertion that they did not intend to use at trial any property recovered from Maxis.

upper hand in the fight, Maxis staggered to his car, retrieved a pistol from under the driver's seat, walked back to Cooper, and shot him twice. Wills also testified that Maxis then got into his car with Stokes and fled the scene.

Kevin Doggett, Wills's then-boyfriend and another resident of Cooper's apartment building, testified that he arrived home the night of the offense to find Cooper and Wills in a fight in their hallway. Doggett testified that as he tried to call the police, Cooper knocked his cell phone out of his hand, and Doggett then went up to his apartment. Soon after, Doggett testified that Cooper called up to him to come outside and fight, and that when Doggett went downstairs to do so, he came upon Cooper fighting with Stokes on the front steps of the apartment building. After Doggett told Cooper, "You are not going to hit that young lady, Mr. Cooper," Doggett testified that he saw a man who looked like Maxis walk up from down the street, and that Stokes told that man that Cooper had been in her face. Doggett testified that the man then slapped Cooper in the face, after which a fight ensued. Doggett also testified that during the fight, Stokes hit Cooper in the back of the head with a beer bottle, and that Doggett attempted to break up the fight to no avail. Doggett then testified that the man who resembled Maxis staggered to his car, retrieved a pistol from under the driver's seat, walked back to Cooper, and shot him four times.

After these witnesses testified, the trial court held that in spite of her finding that a *Payton* violation had occurred, sufficient attenuation existed to justify admitting the subsequent lineup identifications of Maxis and his statement to law enforcement.

      b.       *The Trial and Sentencing*

Maxis proceeded to a jury trial before Justice Demarest in April of 2001. The People called Detective Ryan, Wills and Doggett, who gave substantially the same testimony

they had given at the *Dunaway/Huntley/Wade* hearing. The People also called Police Officer Daniel Mulvanerty, who testified regarding the ballistic evidence recovered from the scene, *i.e.*, discharged gun shells containing no fingerprints; Jerome McMillan, who testified that he looked out of his apartment window on the night of the shooting and saw Cooper fighting with another man, and corroborated Wills's and Doggett's account of the fight and the shooting (without identifying Maxis as the shooter); Detective Anthony Stevenson, who testified that he tracked down the owner of a car parked on the street near Cooper's apartment building at the time of the shooting and passed that information on to Detective Ryan; Santos Valladares, who provided Stevenson with the license plate number of the vehicle parked near Cooper's apartment on the night of the shooting; Detective Nicholas Simms, who testified that he possessed a search warrant to search Maxis's apartment that had been drawn up by Detective Ryan, that he and other police officers executed the search warrant late in the evening of July 26, 2001, and that he seized and vouchered Maxis's blood-spattered sneakers during that search; Lisa Palumbo, a criminalist who testified that blood samples extracted from Maxis's sneakers belonged to Cooper; and Dr. Frede Frederic, who performed Cooper's autopsy and testified regarding the injuries he observed on Cooper.

The defense called Police Officer Norman F. Maes, who testified regarding his observations of Cooper's body at the crime scene on the night of the shooting and the fact that he did not see anyone attempting to approach Cooper's body.

At the conclusion of the trial, only the intentional second-degree murder charge, *id.* § 125.21(1), was submitted to the jury, and on May 1, 2002, the jury convicted Maxis of that offense. On May 21, just prior to the scheduled sentencing, defense counsel requested an

adjournment so that he could investigate information he had just received from another attorney[4] regarding an alleged recantation by one of the People's witnesses. The trial court denied counsel's request on the ground that he could not substantiate such information, and sentenced Maxis that same day to a term of imprisonment of seventeen years to life.

2.    *The Direct Appeal*

On appeal, Maxis argued that: (1) the evidence seized from his vehicle should have been suppressed as the product of a warrantless search; (2) evidence seized from his apartment should have been suppressed as the product of a warrantless search and because the detective who testified about the search at trial lied by saying he possessed a warrant at the time of the search; (3) he was denied the effective assistance of counsel when his attorney failed to object to the admission of evidence seized from the car and apartment on the ground that the searches were conducted without a warrant; and (4) the trial court erred when it denied Maxis's request for an adjournment of sentencing to investigate whether the People's witness had recanted. The Appellate Division affirmed the judgment of the Supreme Court in an April 15, 2008 decision. *People v. Maxis*, 855 N.Y.S.2d 251 (2d Dep't 2008). On August 19, 2008, a judge of the Court of Appeals denied Maxis's application for leave to appeal from the Appellate Division's decision. *People v. Maxis*, 11 N.Y.3d 738 (2008) (Graffeo, J.).

3.    *The Motion To Vacate the Conviction*

On August 9, 2007, while the direct appeal was pending, Maxis filed a motion to vacate his conviction under New York Criminal Procedure Law § 440.10. He raised the same four claims in his motion as those raised on direct appeal, and also asserted that newly discovered evidence would have changed the outcome of his trial. The Supreme Court denied

---

[4]    The attorney who gave Maxis's trial counsel this information was Maxis's current counsel, Robert DiDio. Trial counsel stated that DiDio had called him with the news that the People's witness had come into his office and stated that his testimony was coerced and that he wished to recant it.

the motion without a hearing in a written opinion dated February 19, 2009.  Ex. 10 to Philips

Opp'n, at 5.  With respect to Maxis's ineffective assistance of counsel claim, the court held that

this type of claim is properly raised on direct appeal, and invoked the Appellate Division's

conclusions that Maxis's trial counsel had not been ineffective and Maxis could not rely on trial

testimony to challenge a suppression issue where he had failed to request a reopening of the

suppression hearing.  The court further held that Maxis had waived his suppression claims by

failing to raise them in a motion to reopen the suppression hearing, and that those claims also

were procedurally barred because Maxis had failed to adduce facts on the record so as to permit

review of the claims on direct appeal.  The court also declined to address Maxis's claim

regarding the denial of an adjournment because Maxis had presented no new evidence on that

claim, and denied Maxis's claim of newly discovered evidence on the ground that Maxis had not

alleged a legal basis for the claim and had failed to submit an affidavit besides his own or other

evidence supporting the claim.

     Maxis sought leave to appeal from the Supreme Court's denial of his § 440

motion, but the Appellate Division denied this application on March 5, 2009.  Ex. 11 to Philips

Opp'n, at 2.

     4.    *The Instant Petition*

     Maxis filed this habeas petition on March 5, 2010 seeking relief from his state

court conviction pursuant to 28 U.S.C. § 2254.  Maxis first claims that he was deprived of his

constitutional right to effective assistance of counsel because his attorney (1) failed to object at

trial to the police's warrantless search of Maxis's vehicle, (2) failed to object to the admission of

a detective's testimony regarding his observations of Maxis's vehicle, (3) failed to discover and

object to the warrantless nature of the police's search of Maxis's home, (4) failed to object to the

admission of evidence recovered pursuant to the search of Maxis's home, and (5) failed to move to reopen the suppression hearing on the ground of the detective's allegedly perjured testimony that he possessed a warrant when he searched Maxis's home. Maxis also claims that the trial court committed constitutional error when it denied defense counsel's request for an adjournment in light of information that one of the People's witnesses had recanted his testimony.

5. *Evidentiary Hearing*

After oral argument on September 28, 2010, I determined that an evidentiary hearing was appropriate. I so informed the parties in an order dated October 5, 2010,[5] and the hearing was held on November 15, 2010. The following witnesses testified at the hearing: Joseph Santo, Maxis's trial counsel; Claire Maxis, the petitioner's mother; Maxis himself; and Detective Investigator Joyce Mariner, who participated in the execution of the search warrant for Maxis's apartment.

Based on that testimony, I make the findings of fact set forth below:

The search of Maxis's apartment did not occur prior to the issuance of the warrant authorizing the search. There was scant reason for trial counsel to believe otherwise, and he reasonably believed, based on his review of the DD-5 and other paperwork, that there was no such impropriety in the timing of the search.

Trial counsel had no legal or tactical reason to challenge the search of Maxis's car. Claire Maxis testified to a version of the relevant events that included certain unique facts; for example, she testified that the driveway to the rear of Maxis's home was blocked by a locked

---

[5] The order further informed the parties that I wanted to hear evidence related to the following questions: (1) whether the search of Maxis's apartment occurred before the search warrant for the apartment was obtained; (2) if it did, whether Maxis's counsel was ineffective in failing to seek relief on that ground; (3) whether the search of Maxis's vehicle occurred before the search warrant for the vehicle was obtained; (4) if it did, whether Maxis's counsel was ineffective in failing to seek relief on that ground; and (5) whether the People ever promised prior to trial not to introduce evidence at trial that was recovered from Maxis's apartment or vehicle, as opposed to his person. In addition, I informed Maxis's current counsel that he was expected, pursuant to *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam), to procure the presence of Maxis's trial counsel at the hearing.

gate with a "big heavy duty chain and big padlock," Hearing Tr. at 58, a detail that is conspicuously absent from Maxis's prior submissions, *see, e.g.*, DiDio Aff. ¶¶ 19-20, Aug. 9, 2007, Ex. 6 to Philips Opp'n, at 8-9. I find she testified falsely in that regard and others out of her understandable desire to help free her son from prison.

Trial counsel had a clear and well-thought-out strategy. Since Maxis admitted both to the police and to his attorney that he was present at the scene and fought with (and was beaten severely by) the deceased, the bloody sneakers recovered from Maxis's apartment were not worth fighting over. They merely confirmed Maxis's admitted presence at the scene. The defense theory was that others present at the scene had the motive to murder the victim and in fact did so. Since the victim had a well-earned reputation as a bully within his building, and both of the eyewitnesses indeed had a motive to kill him, counsel's strategy was sound. It was also endorsed by Maxis himself, and I do not credit his contrary testimony at the hearing. The alternative strategies suggested by Maxis's current counsel at oral argument – that counsel might have tried to suppress the sneakers and then present an alibi he knew to be false, or that counsel might have moved to suppress the statements to the police on the (still unsupported) ground that they were coerced – would have been unsuccessful and probably unethical as well.

## DISCUSSION

A.    *Standards of Review*

1.    *Exhaustion and Procedural Default*

28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of habeas corpus unless the petitioner first has exhausted all available state judicial remedies. In order to have exhausted those remedies, a petitioner must have "fairly presented" his federal constitutional claim to the state courts by apprising them of "both the factual and the legal

premises of the claim he asserts in federal court." *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). An unexhausted claim that can no longer be exhausted is deemed procedurally defaulted. *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))). Furthermore, where there has been actual and explicit reliance upon procedural default to dispose of a claim in state court, there is an "adequate and independent state ground" for the judgment, prohibiting federal habeas review. *Harris v. Reed*, 489 U.S. 255, 261 (1989); *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001) (state court's reliance must be "unambiguous and clear from the face of the opinion"); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995); *see also Coleman v. Thompson*, 501 U.S. at 750 (noting the state's interests in "channeling the resolution of claims to the most appropriate forum, in finality, and in having the opportunity to correct its own errors"). *But see Lee v. Kemna,* 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question").

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court. *See Harris v. Reed*, 489 U.S. at 260-62 (explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at 750. However, there are two circumstances in which a federal claim that has been procedurally defaulted – or deemed procedurally defaulted due to the exhaustion requirement – will nonetheless be reviewable on a federal petition for habeas corpus.

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (quotation marks omitted) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To show prejudice, a petitioner must demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quotation marks omitted).

Second, even if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, i.e., "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." *Schlup*, 513 U.S. at 321-22 (quotation marks omitted).

2.      *Review of State Court Adjudications on the Merits Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*[6]

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Elaborating on this standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility

---

[6] This limitation on relief is referred to as "AEDPA deference." *E.g.*, *Jimenez v. Walker*, 458 F.3d 130, 135 & n.2 (2d Cir. 2006).

fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see also id.* at 786-87 (a state prisoner seeking federal habeas relief "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Richter*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

In addition to the deference owed to state court determinations of fact under § 2254(d), subsection (e) requires that a federal habeas court presume all state court factual determinations to be correct. The petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.  *Maxis's Claims*

1.  *Ineffective Assistance of Counsel*

Maxis claims that he was denied effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments, and bases this claim on a litany of errors by his trial counsel. Because the state courts adjudicated the merits of his claim, Maxis must prove that those courts either identified the federal standard for ineffective assistance but applied that standard in an objectively unreasonably way, or applied a rule that contradicts the federal standard. *See Lockyer v. Andrade*, 538 U.S. 63, 73, 75-76 (2003).

A Sixth Amendment ineffective assistance of counsel claim inherently invokes "clearly established" federal law within the meaning of AEDPA. *Williams*, 529 U.S. at 390-91; *Sellan*, 261 F.3d at 309. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant claiming ineffective assistance of counsel must establish that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* at 687-94; *see also Richter*, 131 S. Ct. at 792 (in order to satisfy the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable"). My inquiry on habeas review is not whether the Appellate Division's rejection of Maxis's ineffective assistance claim was incorrect, but whether, in light of *Strickland*, it was objectively unreasonable. *See Richter*, 131 S. Ct. at 786, 788.

    a.     *Search of Maxis's Vehicle and Admission of Evidence Recovered Pursuant to That Search*

Maxis first claims that he was denied effective assistance of counsel because his attorney failed to object at trial to the police's warrantless search of Maxis's vehicle, and failed to object to the admission of evidence obtained as a result of that search.

Maxis's counsel, Joseph Santo, neither asked Detective Ryan on cross examination whether he had possessed a warrant to search Maxis's vehicle at Maxis's residence nor explored how much of the vehicle Ryan could see from the public street in front of Maxis's building. In this regard, Santo did not raise the claim that Ryan violated the Fourth Amendment or the more protective article I, § 12 of the New York Constitution,[7] *see People v. Scott*, 79 N.Y.2d 474 (1992), by walking down Maxis's driveway to further investigate the vehicle he

---

       [7]     A defendant's federal constitutional right to effective assistance of counsel may be violated by his attorney's failure to raise a meritorious state law claim or defense. *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) (citing *Claudio v. Scully*, 982 F.2d 798, 803 n.5 (2d Cir. 1992)).

could see partially from the street, and by proceeding to search the vehicle without a warrant. In addition, counsel did not object when: (1) Ryan testified as to the blood he observed on the driver's side window and seat of Maxis's vehicle, or the missing rear license plate; (2) the People offered into evidence photographs depicting the blood and the license plate; or (3) criminalist Lisa Palumbo testified regarding the blood samples extracted from the vehicle.

My inquiry into whether counsel's performance as recited above was deficient under *Strickland* requires assessing if there is any merit to Maxis's claim that the police's search of his vehicle and the trial court's admission of evidence recovered as a result of that search violated the Fourth Amendment or article I, § 12 of the New York Constitution. The crux of Maxis's claim is that he had a legitimate expectation of privacy in the driveway in which his vehicle was parked when the police found and searched it.

The Supreme Court has recognized that the Fourth Amendment protects the "curtilage" of a house, *i.e.*, an area that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (quotation marks omitted); *see also United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996) (stating that the touchstone of the Fourth Amendment inquiry is "whether Reilly had a reasonable expectation of privacy in his cottage"). The *Dunn* Court opined that the question of whether an area constitutes protected curtilage should be resolved by reference to four factors: the proximity of the area to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301.

Detective Ryan testified that Maxis's vehicle, or what appeared to be his vehicle, was parked at the end of a common driveway between Maxis's building and an adjacent

residential building, in front of several garages that abutted the driveway. While the vehicle was partially hidden from Ryan's view on the public street, the area in which the vehicle was parked was not curtilage, as the driveway was shared by and accessible to the three tenants in Maxis's building and the residents of the building on the other side of the driveway. *See People v. Allen*, 865 N.Y.S.2d 231, 233 (2d Dep't 2008) (stating that "a defendant has a diminished expectation of privacy in the open areas of a building which are subject to the common use of the tenants in that building," and finding defendant had no legitimate expectation of privacy in his apartment building's vestibule "as it was accessible to all tenants and their invitees") (quotation marks omitted); *People v. Colletta*, 736 N.Y.S.2d 213, 213-14 (4th Dep't 2001) ("'A person who occupies premises jointly with another has a reduced expectation of privacy since he assumes the risk that his house-mate may engage in conduct that authorizes entry into the premises.'" (quoting *United States v. Lovelock*, 170 F.3d 339, 345 (2d Cir. 1999))) (citations omitted). The driveway was partially visible to the public from the street and there is no "evidence of an intent to exclude the public." *People v. Warmuth*, 589 N.Y.S.2d 522, 523 (2d Dep't 1992). It therefore does not qualify as an "area around the home to which the activity of home life extends." *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984) (defining "curtilage"); *see also People v. Reilly*, 606 N.Y.S.2d 836, 838 (3d Dep't 1994) ("Curtilage is generally defined as an area that is related to the 'intimate activities of the home.'" (quoting *People v. Reynolds*, 71 N.Y.2d 552, 558 (1988))) (citations omitted). Although the New York Court of Appeals has opined that "a private driveway leading to a home is not outside the area entitled to protection against unreasonable search and seizure," the driveway at issue here cannot be characterized as private, and even if it could, the Court of Appeals has declined to extend such protection to areas as to which defendants do not have a "logical expectation of privacy." *People v. Farenga*, 42 N.Y.2d

1092, 1093 (1977) (no logical expectation of privacy in "private driveway . . . in which the defendants' activities were carried on in such an overt manner"). The ease with which someone could peer into the driveway from the public street and the fact that the driveway was shared argue against a finding that Maxis had a reasonable expectation of privacy in the driveway.[8]

It was not objectively unreasonable for Maxis's counsel to decide against challenging Ryan's search of Maxis's vehicle, moving to suppress the evidence concerning the vehicle, and objecting to the admission of such evidence at trial. Even assuming *arguendo* that New York law recognized a legitimate expectation of privacy of Maxis in the shared driveway, which the foregoing case law does not support, counsel chose a trial strategy – based principally on Maxis's statements to the police – with which the evidence related to the vehicle was entirely consistent. That defense acknowledged that Maxis had been in a vicious fight with Cooper, and accordingly, the evidence of the blood on the vehicle did no harm to the defense. Moreover, counsel argued in summation that Maxis had nothing to hide, and that his choice to park his vehicle in a common driveway reflected this mindset. *See* Tr. at 889. He also argued that the missing rear license plate was an "innocent circumstance," and that if Maxis truly had wished to cover his tracks, he would have removed both license plates or abandoned the vehicle. *See id.* Counsel's strategic decision to present the evidence relating to the vehicle as proof that Maxis lacked a culpable state of mind fell "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and I therefore find that Maxis has failed to satisfy the "performance" prong of *Strickland*.

---

[8] As discussed above, Claire Maxis, Maxis's mother, testified at the evidentiary hearing before me, and her testimony raised – for the first time in these proceedings – the allegation that there had been a padlocked gate barring entry to the driveway at the time the events in this case unfolded, and that the police broke the lock in order to access the driveway early on the morning of July 27, 2001. *See* Hearing Tr. at 58-59. I did not find Ms. Maxis's testimony to be credible, and as a result, I do not consider it in my analysis of Maxis's ineffective assistance of counsel claims.

b.       *Search of Maxis's Home and Admission of Evidence Recovered Pursuant to That Search*

As additional examples of ineffective assistance of counsel, Maxis points to Santo's failure to discover or object to the warrantless nature of the police's search of Maxis's home, and Santo's failure to object to the admission of evidence recovered pursuant to that search. Prior to the November 15, 2010 evidentiary hearing, the record was ambiguous as to precisely when the search warrant for Maxis's apartment was issued by the Criminal Court justice and executed by the police. The warrant is dated "Brooklyn, N.Y. July 26, 2001," but when it was signed by the justice, its date was apparently modified by hand to read, "New York, N.Y. July 27, 2001 3:10 AM." Detective Simms testified at trial that he, Detective Mariner and Sergeant Meade executed the search warrant "very late" in the evening on July 26 – "maybe like 9 or 10 [p.m.]," he guessed, Tr. at 747 – and that he possessed the warrant at the time of its execution. But Detective Mariner's DD-5 report in connection with the search states that she, Simms and Meade executed the warrant at about 3:30 AM on July 27. Maxis deduces from the handwritten date on the warrant and the detectives' testimony that the police searched the apartment on the evening of July 26, 2001, that they lacked a warrant when they performed that search and that Simms's testimony to the contrary was false and was given with the apparent complicity of the prosecutor.

As stated above, I find based on the testimony at the hearing, which included the testimony of Detective Mariner, that the search of Maxis's apartment did not occur prior to the issuance of the warrant authorizing the search. Accordingly, Santo was not deficient in failing to probe the issue of the timing of the warrant's procurement and execution. The same is true with respect to Santo's failure to object to the admission of Maxis's sneakers and the testimony regarding the blood test results of the blood samples on the sneakers. Santo and Maxis built their

trial strategy around Maxis's admission to being at the scene of the crime when Cooper was shot. The presence of Cooper's blood on Maxis's sneakers was consistent with this defense; it thus was not unreasonable of Santo to refrain from objecting to the admission of that evidence.

      c.     *Failure To Move To Reopen the Suppression Hearing*

Maxis also claims that Santo's failure to move to reopen the suppression hearing based on Detective Simms's having perjured himself deprived him of effective assistance of counsel. As recited above, I am not persuaded that Simms intentionally testified falsely regarding the timing of the receipt and execution of the search warrant for Maxis's apartment. I thus reject the argument that Santo's failure to move to reopen the suppression hearing on this ground amounted to deficient performance under *Strickland*.

In sum, I find that the state courts did not unreasonably apply the first prong of *Strickland* in rejecting Maxis's ineffective assistance of counsel claims on the merits. Having reached this conclusion on the "performance" prong, I need not address *Strickland*'s second prong, *i.e.*, whether Maxis was prejudiced by Santo's representation. *Sellan*, 261 F.3d at 317; *see also Palacios v. Burge*, 589 F.3d 556, 566 (2d Cir. 2009) ("Because Palacios's claim fails to demonstrate constitutionally deficient 'performance,' the first prong of the *Strickland* test, this court need not reach the second 'prejudice' prong.").

    2.    *The Trial Court's Denial of Defense Counsel's Request for a Continuance at Sentencing*

Finally, Maxis contends that the trial court committed constitutional error when it denied defense counsel's request for a continuance at sentencing in light of newly discovered information that Jerome McMillan, one of the People's witnesses, had recanted his testimony.[9]

_____

[9]     Maxis also claims that the trial court committed constitutional error in failing to hold an evidentiary hearing to explore whether a prosecution witness (Detective Simms) had given false testimony at trial, Pet. at 10, and to address the issue of Jerome McMillan's alleged recantation, *id.* at 9. In light of my findings,

The state courts denied this claim on the merits, and I therefore examine it under AEDPA's deferential standard of review.

Implicit in Maxis's claim of trial error is the contention that the court's failure to grant counsel's request for a continuance at sentencing violated Maxis's rights under the Sixth and Fourteenth Amendments to a fair trial and due process of law. Not only do I find that the state courts' rejection of this claim, both on direct appeal and in disposition of Maxis's § 440 motion, was well founded in light of Maxis's failure to submit an affidavit from McMillan or other evidence substantiating his recantation, but also I reject Maxis's contention that this ruling violated his constitutional rights to a fair trial and due process. McMillan's testimony, which did not identify Maxis as the shooter but merely corroborated the other witnesses' testimony regarding the physical altercation that led to Cooper's death, was not central to Maxis's conviction and was of lesser importance at trial than the testimony of several of the People's other witnesses. I accordingly find that the state courts' rejection of Maxis's claim regarding the denial of counsel's request for a continuance was not an unreasonable application of federal law. *See Drake v. Portuondo*, 321 F.3d 338, 344 (2d Cir. 2003).

---

described above, regarding the timing of the detectives' execution of the search warrant for Maxis's apartment, and my conclusion that McMillan's testimony was by no means central to Maxis's conviction, I reject these claims as meritless. I also find Maxis's claim that the prosecutor misled the trial court and the defense at the pre-trial stage regarding the validity of the warrants, *id.*, to be wholly without merit.

CONCLUSION

For the foregoing reasons, the petition is denied. As Maxis has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.


Date:   April 13, 2011
        Brooklyn, New York